## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| MARY LINEHAN, | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| vs. | § | **CIVIL ACTION NO. 6:16-cv-00066** |
| | § | |
| UNIVERSITY OF TEXAS AT TYLER, | § | |
| | § | |
| | § | |
| | § | |
| **Defendant,** | § | **JURY TRIAL DEMANDED** |

## PLAINTIFF'S SECOND AMENDED COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Plaintiff, Mary Linehan ("Linehan" or "Plaintiff"), complaining of Defendant University of Texas at Tyler ("UTT" or "Defendant"), and pursuant to the Court's Order dated March 7, 2017, files this her Second Amended Complaint and for causes of action would respectfully show the Court as follows:

## I.

## INTRODUCTION

1.01    Plaintiff has brought this action for sex discrimination and unlawful retaliation under Title VII, Chapter 21 of the Texas Labor Code and the Texas Commission on Human Rights Act. Plaintiff alleges that Defendant, through its agents, engaged in a pattern of sex discrimination that in hindsight spanned over several years and has resulted in distinct actions of sex discrimination that are actionable and fall within the jurisdiction of this Court.

1.02    In June, 2014, Plaintiff reported recurring events of sexual bias occurring as far back as 2010, and as recently as 2014, to Defendant's Human Resources Department. Plaintiff's report

was based upon a good-faith and reasonable belief that she had been a victim of a recurring pattern of sex discrimination. At the same time that she reported these incidents to the defendants Human Resources department, Plaintiff notified Defendant that she had also contacted the Equal Employment Opportunity Commission with the intent to file a complaint of unlawful gender discrimination. Consequently, Plaintiff engaged in protected activity by the notification of the EEOC and of Defendant of her claim of sex discrimination that was based upon her good faith belief.

1.03    Defendant rejected Plaintiff's complaint and expanded the charges against Plaintiff two days after receiving notice of Plaintiff's Title VII claims. Defendant retaliated against Plaintiff by placing her on an indefinite administrative leave for the stated reason that this leave was necessary so that Defendant could investigate certain meritless charges by certain students based on events, which allegedly occurred in the Spring Semester of 2014.

1.04    Defendant's actions in response to Plaintiff's complaint were willful and retaliatory. These actions materially affected Plaintiff's conditions of employment. The terms of the imposed mandatory leave were so restrictive that Plaintiff could not come on the University campus. Although Plaintiff still had email access, Plaintiff did not get her regular emails and emails from Plaintiff's publishers were returned "addressee unknown." The actions were so restrictive as to create the impression that plaintiff's employment had been terminated when in fact it was not. Defendant's actions towards Plaintiff materially affected her professional reputation. Not only was Plaintiff prevented from all access to the University, colleagues, faculty and her own teaching materials, the imposed leave of absence had the foreseeable, and therefore intentional, consequence of rendering Plaintiff ineligible for numerous teaching and promotional opportunities over the next two academic years. Defendant's actions have been both discriminatory and retaliatory and have caused Plaintiff to

suffer significant monetary damages.

1.05    This mandatory administrative leave also caused Plaintiff to suffer severe emotional distress in the form of anxiety, humiliation, loss of sleep, and loss of self-esteem.

1.06    Defendant's stated purpose for this mandatory indefinite suspension was a pretext for retaliation. Investigations into charges of the nature brought against Plaintiff normally take less than 60 days to investigate and reach appropriate findings. UTT's investigation lasted from May, 2014 until December 21, 2015, over 602 days. The Mandatory Leave and accompanying restrictions were not lifted until May 31, 2016. This represents more than two academic years. Throughout this period, Defendant kept Plaintiff in exile from her students, peers, members of her own faculty, and UTT's resources upon which Plaintiff depends to perform her professorial and academic research. UTT's discriminatory and retaliatory actions were deliberate, willful and punitive, because the terms of this leave go far beyond what was necessary, given the original allegations, to conduct an efficient investigation of the charges that were raised. UTT conditioned Plaintiff's leave of absence upon several restrictions that Defendant knew would be a severe hardship to Plaintiff and damaging to her career, reputation, and future employment in higher education. The terms of the administrative leave also prevented Plaintiff from being eligible for paid teaching positions during the summers of 2014 – 16. At the same time, Plaintiff was required to remain available during all business hours. Consequently, whenever Plaintiff had to leave Tyler to go out of state for personal or medical reasons, she always requested and waited for Defendant's approval before she could leave her home.

1.07    By placing Plaintiff on such an extensive and restrictive leave of absence, UTT created the impression to both faculty and students that Plaintiff was guilty of all charges and had been terminated for alleged but, as yet, unproved wrongdoing.

1.08    After she was placed on mandatory leave, Plaintiff discovered that Defendant expanded the scope of its investigation into events, which occurred as early as 2010, but was never the subject of any complaint or prior disciplinary action. Defendant also has elected to punish Plaintiff for class attendance, which had previously been the subject of an accommodation for Plaintiff's disability. Plaintiff had received no prior notice that her attendance was to be the subject of any inquiry or complaint.

1.09    in addition to her original charge of discrimination, Plaintiff filed an amended charge to add further acts of retaliation and discrimination. Plaintiff has received timely rights to sue on both charges and is filing this second amended complaint in pursuant to The court order and within the 90 day limit of the Notice of Right to Sue issued on Plaintiff's second EEOC charge.

## II.

## PARTIES

2.01    Plaintiff Mary Linehan is an individual who resides at 1505 Grande Blvd., Apt. # 403, Tyler, TX 75703 and may be contacted through the undersigned counsel. .

2.02    Defendant University of Texas at Tyler is a state and federally funded university located at 3900 University Boulevard, Tyler, TX 75799. Defendant is represented by the Texas Atty. Gen.'s office located in Austin Texas.

## III.

## JURISDICTION AND VENUE

3.01    The jurisdiction of this Court is invoked pursuant to the Texas Human Rights Act ("TCHRA"), Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and through the doctrine of supplemental jurisdiction.

3.02    Venue for all causes of action stated herein lies in the Northern District of Texas because the acts alleged in this Complaint took place in whole or in part within the boundaries of this District, pursuant to 28 U.S.C. § 1391.

3.03    Defendant has waived its sovereign immunity from being sued under the aforementioned statutes because at all relevant times herein and through the present date, Defendant has received and continues to receive federal funding. Consequently, Defendant is not immune from suit and this court has jurisdiction to hear all claims against Defendant.

3.04    All conditions precedent to suit have been satisfied as Plaintiff filed a timely charge of discrimination with the United States Equal Employment Opportunity Commission on March 9, 2015, and received her Notice of Right to Sue on December 5, 2015. (See Exhibits A and B attached hereto).  Plaintiff filed her second EEOC charge on February 3, 2016, and received a second Notice of Right to Sue on or about December 20, 2016. (See Exhibits C and D)

3.05    Defendant UTT has, at all relevant times, employed over twenty (20) employees in the current or preceding calendar year and has waived sovereign immunity under the Texas Human Rights Act and Title VII.

3.06    Defendant, UTT is an employer within the meaning of the Texas Human Rights Act and Title VII.

## IV.

## FACTUAL ALLEGATIONS

4.01    Plaintiff is a 56-year old female and has been a tenured Associate Professor at UTT since April 8, 2009.  She has over 25 years' teaching experience, an unblemished record, and five all-campus teaching awards from three universities.  Plaintiff teaches US History with a specialization in

the role of women in history. That course has been taught yearly at UTT. It is well attended and popular with both male and female students thanks to Plaintiff's superior teaching abilities and experience.

4.02    With the exception of the last two years, Plaintiff has taught each academic year and every summer since 2009. These are extra courses, from which Plaintiff has derived a significant additional income. From, 2009 through 2012, Plaintiff consistently received favorable performance appraisals from her students, peers, and administrators regarding her teaching, scholarship, and service accomplishments as a university professor. As of December, 2013, Plaintiff had the second-highest teaching evaluations in her department.

4.03    The pattern of discriminatory treatment towards Plaintiff began in approximately 2010, when Plaintiff began to experience increasing episodes of adverse treatment which, in hindsight, were gender-based because she was female. When reviewed in their entirety, these events strongly suggest that Plaintiff was a victim of repeated gender discrimination.

4.04    Plaintiff and other female professors found that the work environment had become increasingly hostile towards women. This finding was based on the fact that UTT offers only three courses about women. The course entitled "Women in U.S. History" was not added to UTT's curriculum until 2010, forty years after such a course was viewed as standard at other southern universities. Plaintiff and one other female are the only two women in the department who have ever received tenure. The last two women who came up for tenure were both denied by the administration. Five of the last six job openings in the department were given to men. Women made up only 17% of the candidates brought to Defendant's campus to interview for these positions.

4.05    Examples of gender bias experienced by the Plaintiff between 2009 through the

present date include:

    a.    In 2010, Plaintiff had an excellent Annual Review and unanimous support of the faculty. Notwithstanding these reviews and faculty support, Defendant removed Plaintiff as Department Chair and replaced her with a less qualified male. UTT's stated reasons for Plaintiff's removal from the chair were because she was "high handed" and had "unmanned" a former male professor. In fact, Plaintiff had added a course in Women's History to the curriculum with the full approval of the former Dean and Provost's Office. Plaintiff's professional work was dismissed by the Interim Dean as "he said/she said" and because she was teaching a course on women's history.

    b.    Plaintiff has not received her legally required performance evaluations for Academic years 2014, 2015, 2016, and was denied the opportunity for Post-Tenure Review, which Plaintiff observed, was given to similarly situated male professors. This denial has adversely and unfairly affected the Plaintiff's ability to ever pursue a promotion to the position of Full Professor, a position for which Plaintiff was fully qualified.

    c.    Between 2010 through the present date, Plaintiff was been consistently awarded lower merit bonuses than were awarded to male professors within her department at her level. Plaintiff knows of at least one male Associate Professor, who has similar teaching ratings, less experience, and significantly fewer publications. This professor received a significantly higher merit increase than Plaintiff.

    d.    During the 2013/2014 academic year Defendant's administration placed severe restrictions on Plaintiff's teaching. Three of the courses permanently assigned to Plaintiff were re-assigned to less qualified male professors over her objections and protests. No

similarly situated male professor has "lost" a course during this period.

4.06    Despite Plaintiff's prompt reports of these events to her supervisor and requests for assistance, Plaintiff received no protection from the gender-based workplace bullying.

4.07    The final straw occurred in the spring semester of the 2013-2014 academic year. Plaintiff taught a History course in which Plaintiff and her students engaged in lively exchanges over the course subject matter. All but one of the students in Plaintiff's class was familiar with Plaintiff's teaching methods because they had taken Plaintiff's courses many times in the past. In this particular class, Plaintiff encountered several students who did not do the assignments, plagiarized the work of others, and caused repeated disturbances in Plaintiff's class.

4.08    Plaintiff s consulted with her supervisor, Marcus Stadelmann ("Stadelmann") via email to explain the situation that was happening in her class and sought his guidance on how to address these weaker students' performance without compromising the remaining 75% of the students, who were meeting the course expectations.

4.09    Stadelmann knew that Plaintiff had re-weighted the course grades in the second half of the semester, because Plaintiff had kept him informed of this step. Plaintiff did this so that the weaker students, who had not obtained a passing grade in the first half of the semester, could still pass the course if they achieved an "A" for the second half of the semester.  Assignments with advisory grades were also posted on the Blackboard Learning System so that these weaker students could see exactly what was expected to achieve this grade.

4.10    In March, 2014 Plaintiff learned from some students that a disgruntled minority had complained to Stadelmann over the change in the grading system for this course. Plaintiff suggested to Stadelmann that she return two the original grading method. Stadelmann told Plaintiff to adhere to

the changes and to keep those students, who approved the changes and were bothered by the classroom disruptions away from the Dean.

4.11    Plaintiff followed Stadelmann's directive and adhered to the changed grading procedure. Plaintiff continued to teach the course in reliance upon the support from her Chair and Associate Dean Ken Wink ("Wink").  Plaintiff had kept Stadelmann and Wink informed of the developments in the class. Neither Stadelmann nor Wink expressed any concern or disapproval over Plaintiff's management of the class. Plaintiff actually expressed gratitude for their kindness and help.

4.12    The teaching evaluations for this same class showed that the majority of students were pleased with the course and their classroom experience.

4.13    Plaintiff was stunned to receive a notice on May 13, 2014, that certain unnamed students had accused Plaintiff of sexual harassment. Plaintiff has never sexually harassed anyone in her life. Nor has Plaintiff ever engaged in any inappropriate behavior of a sexual nature in the workplace.

4. 14    Plaintiff received no information about who made these allegations or about the specific allegations.  Plaintiff reached out to Stadelmann for counsel and advice, but received no response to her requests for help and guidance.

4.15    On May 14, 2014, Stadelmann, canceled and reassigned Plaintiff's regularly scheduled summer courses. Plaintiff had always relied on these courses for additional income. Stadelmann's notice of cancellation of Plaintiff's summer courses was the last communication that Plaintiff received from her department. Staddleman offered no response to Plaintiff's request for guidance and assistance regarding these charges.

4.16    On May 20, 2014, UTT through its agent, Provost Alisa White, UTT canceled two of

the Plaintiff's three fall courses. Stadelmann did not schedule replacement courses for Plaintiff as was his responsibility as Department Chair.  As of this date, May 20, 2014, Plaintiff still did not know the identities of her accusers or the nature of the allegations against her.

4.17   On June 4, 2014, Plaintiff still had not received information about the accusations or who had made them. Plaintiff filed a complaint of gender discrimination with UTT's Human Resources Department. This complaint was based on her reasonable belief that she had been the victim of an ongoing pattern of sex discrimination in the workplace. Plaintiff also notified the Equal Employment Opportunity Commission (EEOC) of her intent to file a claim for gender discrimination and disclosed to UTT's Human Resources Department her intent to file a charge of gender discrimination with that agency. At Defendant's request, Plaintiff provided 125 pages of evidence supporting her discrimination claims. Plaintiff also became aware of at least five male professors and administrators against whom similar complaints of sexual harassment have been brought by students and employees. As of May, 2014, none of these individuals were known to have had been investigated or punished for these complaints.

4.18   Plaintiff believes and therefore asserts that these unknown sex harassment charges that were brought by UTT under Title IX were part of the same pattern of gender discrimination that began in 2010 and have continued throughout Plaintiff's employment with Defendant.

4.19   UTT has previously covered up claims of sexual harassment brought against male administrators in an attempt to protect them.  When five male tenured track professors and administrators had been accused of stalking or sexually harassing female students and employees, none of them had their courses taken away or appear to have been punished in any other way. Plaintiff, on the other hand was treated much more harshly than these other male employees who

were accused of the same offense.

4.20    On June 6, 2014, two days after Plaintiff filed her complaint of discrimination, Plaintiff was finally told of the specific allegations against her and who had made them.

4.21    There were a total of four complaints against Plaintiff. Three of the complaints were from the disruptive students in the Plaintiff's spring course, whom Plaintiff had previously identified to Stadelmann. The other complaint was made by Stadelmann's student assistant, who was enrolled in Plaintiff's spring course.

4.22    All four complaints were strikingly similar. The wording is so nearly identical that they appear to be the result of coaxing and had been rehearsed.

4.23    The central complaint in these sexual harassment charges was about the Plaintiff's teaching method, which actually began in a 2012 Women's History course, where Plaintiff had certain students role-play characters from Victor Hugo's book, "Les Miserables." One student portrayed "Fantine," a character who, while destitute, turns to prostitution to feed her child. This student referred to herself as a "slut". Over the next two years, this same student continued to refer to herself as a "slut" in various courses in front of other students as well as members of the Tyler community.

4.24    On June 18, 2014, Plaintiff provided Defendant with 250 pages of correspondence between herself, these students, and the administration in the College of Arts and Sciences and Department of Political Science and History. This written record confirmed that the student, not the Plaintiff, called herself a "slut" in public address. They also show that the Plaintiff had excellent rapport with these students up until the end of March, 2014, when they began meeting with Dean Martin Slann ("Slann") and Stadelmann.

4.25    Nowhere in the correspondence produced was there any mention by any of the students of sexual harassment or unprofessionalism.  Two of the students in question filed their complaints even as they were enrolling in Plaintiff's upcoming courses.  Also absent from the same correspondence and teaching evaluations for that same class is any specific complaint alleging sex harassment.

4.26    Plaintiff firmly believes that these Title IX accusations made against her in May, 2014, were orchestrated by the deans and their Chair and are further examples of the long history of gender discrimination against Plaintiff. Plaintiff filed her complaint with Defendant's Human Resources Department and notified the EEOC on June 4, 2014, of her complaint in which Plaintiff alleged that Associate Dean Ken Wink ("Wink") Slann, and Stadelmann had engaged in gender discrimination.

4.27    On June 6, 2014, two days after being informed of Plaintiff's complaint, Slann announced that he was launching an investigation of academic misconduct on the grounds that Plaintiff changed the syllabus for the Spring 2014, course in the middle of the semester. Slann was aware that Plaintiff had changed the grade weight because she had kept her supervisor's informed of this action.

4.28    Slann's announced investigation into Plaintiff's changing the grade weight in her spring 2014 course was a pretext for retaliation for her protected activity in the form of filing a complaint with the Human Resources Department. Slann knew that Stadelmann had previously acknowledged Plaintiff's decision to change the grade weight, and he and Wink tacitly approved this Plaintiff's decision.

4.29    Slann also knew that there was no need for this investigation, since the changing of

grade weights in the mid-course was a frequent occurrence and had the Department Chair's approval. Slann had himself been aware of Plaintiff's grade weight changes for over two months, but did not decide to launch the investigation until shortly after Plaintiff filed her complaint of gender discrimination.

4.30    Slann and Stadelmann also knew that Plaintiff had made this change solely to benefit students who needed this help to successfully complete the course. The course evaluations showed that the great majority had no problem with the change.

4.31    Had Slann actually thought that Plaintiff's actions were in violation of any university policy then, as Dean, Slann should have exercised his authority to intervene in March, 2014 when he first learned of the issue.

4.32    The timeline between Slann's awareness of Plaintiff's decision to change the grade weights and his public announcement to conduct a public investigation into Plaintiff's conduct two days after Plaintiff made her complaint against him suggests that Slann's actions were a pretext for unlawful retaliation against Plaintiff.

4.33    On July 15, 2014, the Plaintiff reported Slann's announced investigation as retaliation to the Human Resources Department and to the EEOC.

4.34    On July 17, 2014, Defendant placed Plaintiff on immediate and indefinite paid administrative leave. The timing and terms of this mandatory administrative leave constitutes further retaliation in response to Plaintiff's protected activity, namely exercising her right to protest what Plaintiff reasonably believed to be gender discrimination in the workplace.

4.35    As of July 17, 2014, Defendant's investigation into the Title IX charges of sex harassment was in its 80th day. There was no reason to put Plaintiff on any type of suspension or

leave of absence. The investigation continued until December 18, 2015, but Plaintiff's suspension continued to May 31, 2016 at which time, the Provost announced the final punishment in conclusion of the investigation. During this mandatory leave, Defendant forced Plaintiff to abide by multiple restrictions that accompanied her mandatory leave. Under UTT policy (Handbook of Operating Procedures 2.4.3.i.2.f) which is modeled after the Department of Education policy, charges of sexual harassment are to be investigated and resolved within 60 calendar days after they have been filed. If charges are not resolved during this period, the accused, i.e. Plaintiff, is entitled to regular updates on the investigative progress. Defendant failed to follow its' own procedures and extended the investigation by nearly 2 years, Defendant never provided Plaintiff with any updates of its findings on the complaints of sexual harassment. Nor did Defendant provide Plaintiff with notice of the additional charges for alleged academic misconduct that became the subject of Defendant's investigation proposed disciplinary action.

4.36    By summarily placing Plaintiff on mandatory paid administrative leave, a status that does not exist in Defendant's faculty handbook, Defendant violated Plaintiff's due process rights and jeopardized her earned tenure as an Associate Professor. Although UTT refers to this administrative leave as non-disciplinary and has been paying Plaintiff her base salary, the terms and conditions of this indefinite leave are not just punitive, they are draconian. The terms and conditions of Plaintiff's forced administrative leave were a deliberate retaliatory measure intended by Defendant to either force Plaintiff to resign or serve as a prelude to termination for complaining of and reporting a continuous pattern of gender discrimination by Defendant.

4.37    The terms of the mandatory administrative leave include the following prohibitions:

a.      Plaintiff was prohibited access onto the University campus or university library;

b.    Plaintiff was prohibited from having any contact with any student or employee;

c.    Plaintiff was prohibited from disclosing to any party where she worked or that she was employed by UTT;

d.    In addition to being denied access onto the campus, Plaintiff was also denied access to mail, and to the Blackboard system upon which she had to rely for her course materials and to retrieve evidence in support of her defense against the Title IX charges;

e.    Plaintiff's research funding was cut off;

f.    For the duration of the administrative leave, Plaintiff could not pursue any Post Tenure Review which prevented her from applying for any promotion to Full Professor with accompanying status and compensation. This was in violation of Texas Education Codes 51.942, the Board of Regents Rules, and UTT's Handbook of Operating Procedures;

g.    Plaintiff was further required to remain available "during all business hours," including three months of the year without compensation;

h.    Plaintiff had to request and receive permission from Defendant to leave Tyler for personal or medical reasons;

i.    Plaintiff's office mail was not forwarded to Plaintiff while she was on this mandatory leave; and

j.    Plaintiff was removed from the faculty directory, even though she was a Tenured Professor.

4.38    Plaintiff endured these conditions from approximately July, 2014, until May 31, 2016.

As a direct and obviously intended consequence of this mandatory "administrative leave", Plaintiff's

terms and conditions of employment including financial compensation have been adversely affected.

Plaintiff has had no access to any of the departmental notifications or other information pertaining to

her duties as a tenured Associate Professor. A further direct and obviously intended consequence of

the effect of this "Mandatory Paid Leave" is to place Plaintiff in an academic exile, affect public

perception of her position and reputation within the university, and raise serious questions over the

status of her tenure and employment.

4.39    Another direct and therefore intended consequence of Defendant's actions is that Plaintiff has no research or work product for the last two years to show prospective employers. Under the terms of her mandatory suspension, Plaintiff could not even tell prospective employers that she has worked anywhere since 2009. A further obvious and intended consequence of this imposed leave was that Plaintiff was automatically ineligible to teach summer courses for three consecutive summers. Defendant knew that this restriction would severely affect Plaintiff's financial position.

4.40    Defendant's stated justification for placing Plaintiff on this mandatory leave was purportedly so that it could fully investigate the charges brought by four students regarding an incident that occurred in the course of the spring semester of 2014. Defendant's stated reason was a sham and a pretext since the investigation had already been ongoing for approximately 80 days when the mandatory leave of absence was imposed. The scope of inquiry based on the charges derived from an extremely narrow time frame, such that it should not have taken almost 2 academic years to complete.

4.41    The temporal proximity between Plaintiff's protected activity and the imposition of the mandatory leave with its terms and conditions clearly suggests that it was in retaliation for Plaintiff's protected Activity of complaining of sex discrimination in the workplace. The effect of this indefinite leave, which denied Plaintiff access to the University campus and its facilities, had the obvious and therefore intended effect of creating the impression that Plaintiff had committed an egregious wrong and had been summarily terminated for the same.

4.42    Plaintiff was denied a hearing of the investigation into these charges of harassment

and academic misconduct for a full year. None of Plaintiff's witnesses were interviewed, and Plaintiff now reasonably believes that Defendant has neither read nor considered the evidence that she submitted in defense of these charges.

4.43    The following example is illustrative of Defendant's obvious gender bias: In May, 2015, a male administrator was accused of sexually harassing 13 women over several years. Defendant took only six weeks to investigate and remove the suspected individual.  Yet, in the instant case, UTT has taken over 25 months to investigate four identical complaints by students regarding events that happened in one class in the second half of the Spring, 2014 semester.

4.44    At approximately the same time that Plaintiff was placed under investigation, there were approximately 5 other male members of the faculty and Administration, who had been charged with harassing or stalking female students. None of these individuals were disciplined or placed on leave. Plaintiff believes that no investigation was done into any of these complaints against these male employees.

4.45    In September, 2014, UTT's agent, Amy Clem ("Clem"), issued the report of her investigation into Plaintiff's discrimination complaint. Only 8 pages of the 19 page report dealt with the Plaintiff's charges.  The rest of the report consisted of unsubstantiated attacks on the Plaintiff's character describing her as a failed employee, despite five years of excellent performance evaluations.  Clem neglected to review or examine any of the Plaintiff's evidence in support of her discrimination claim.  Consequently, Clem determined the complaint of sex discrimination had no merit.

4.46    Clem's report contained multiple factual errors. Also, Clem failed to address many of Plaintiff's charges about discrimination. Incredibly, Clem's report was sustained on appeal by Vice-

President Jesse Acosta, who is male and was later forced out of the University himself, for sexual harassment.

4.47    Plaintiff's damages for her discrimination claims are in excess of $100,000 in back pay and denied bonuses, merit increases and automatic ineligibility for summer teaching assignments upon which Plaintiff relied as a source of income.

4.48    Plaintiff has a chronic medical condition that she has been managing throughout her employment at UTT. The stress of the Title IX charges and the imposed leave has aggravated her condition and, in a 10-month period, Plaintiff had five serious trachea surgeries at Cleveland Clinic. Although Clem initially approved the doctor's certification for FMLA leave, Clem waited until 2 days before Linehan was to begin her leave to falsely tell Plaintiff that she would not be entitled to FMLA. Clem then falsely stated that Plaintiff's sick days were almost all gone. It took the intervention of the Department of Labor and Senator John Cornyn's Office for Dr. Linehan to get the benefits to which she was entitled. Clem's abuse of a very sick colleague is further evidence of Defendant's desire to punish Plaintiff for reporting what she reasonably believed to be Title 7 violations. This has caused plaintiff to suffer severe emotional distress, which has aggravated her medical condition.

4.49    On May 6, 2015, Plaintiff attended an interview conducted by Ona Tolliver, ("Tolliver") Dean of Students, serving as the Title IX Investigator, and Dr. Pamela Martin, ("Martin") Assistant Dean of Nursing who served as the investigator into the academic violations. Instead of confining the interview to the charges that had been brought against Plaintiff and of which Plaintiff had received notice, Martin and Tolliver spent a substantial portion of the interview asking Plaintiff about incidents that were remote in time and had nothing to do with the any of the charges.

4.50    Martin and Tolliver made these unrelated and irrelevant inquiries without any context, date, or any information about their origin.  These inquiries dated back to incidents that were over four years old and had nothing to do with the original charges, or any formal complaints. As of today, Plaintiff has not received any written notice of these new areas of inquiry.

4.51    UTT used the interview to ambush and bombard Plaintiff with questions about totally unrelated events that were remote in time and of which Plaintiff had no prior notice. In doing so, Defendant clearly implied that it did not have enough information to justify any serious or permanent disciplinary action against Plaintiff for the only charges on which she had been given notice.

4.52    Another now apparent motive behind the inquiry into these unrelated events was to deliberately expand the investigation and thereby extend the Plaintiff's administrative leave. By doing this, Defendant successfully extended Plaintiff's separation from the department and added to the perception that she had been summarily discharged and was no longer a member of the faculty.

4.53    Over her legal counsel's objection to these questions at the May 6, 2015 interview, Plaintiff fully cooperated and answered these questions to the best of her ability.

4.54    The May 6, 2015, interview is a further clear example of UTT's willful retaliation against Plaintiff for her protected activity. Defendant used unrelated and even trivial events over which Plaintiff had no real memory or prior notice to impeach her credibility and build up a case to justify discipline and/or termination of Plaintiff's employment. This was patently unfair because Plaintiff was never advised that these events were the source of any complaint, much less forewarned that they would be the subject of an investigation of the basis to recommend discipline, since they were over four years old by the time the interview occurred.

4.55    In November, 2015, after still no word of any findings from UTT on the complaints of

sexual harassment or charges of academic misconduct, Plaintiff contacted the American Association of University Professors (AAUP), which put UTT on notice that its treatment of Dr. Linehan violated all professional standards of due process and academic freedom.

4.56    On December 21, 2015, 602 days after the investigation began and in the middle of the Christmas holiday, UTT finally issued its reports on the charges of harassment and academic misconduct.

4.57    The first report was written by Slann, one of the men that Plaintiff had accused of sex discrimination and whom, the evidence suggests, is the very architect of the student complaints. Slann wrote his report without ever speaking to the Plaintiff.  Defendant has now circulated this report to students and faculty.

4.58    Both reports go far beyond the original charges against the Plaintiff and refer to events which occurred as early as 2010 and 2011 during which time; UTT had favorably appraised Plaintiff's Performance.  UTT made these events part of its investigation and relied on them as a basis to recommend discipline up to and including termination.

4.59    The reports refer to incidents dating back as far as 2010 to which the Plaintiff has not been allowed to properly respond.  This confirms Plaintiff's belief that UTT always knew that the original charges were insufficient grounds to justify UTT's ultimate goal to revoke Plaintiff's tenure and terminate her employment in retaliation for her protected activity of complaining about sex discrimination.

4.60    With regard to the academic misconduct, Defendant's report makes no mention that Stadelmann approved the syllabus changes. Instead, the report relies upon suggestion, hearsay and innuendo. None of Plaintiff's exculpatory evidence is included in the report.

4.61   Both of UTT's reports demonstrate Defendant's hostility towards Plaintiff, women professors, and to the teaching of Women's History.

4. 62   For example, several pages in the report regarding Plaintiff's alleged academic misconduct are devoted to events which occurred in 2010 and 2011 when Dr. Linehan hired students to do yard work and other odd jobs at her home. These events were never the subject of any formal charges. Yet, UTT now relies on these events to justify discipline and or termination. Interestingly, the report ignored the fact that several of Plaintiff's male colleagues had hired the same students to do their yard work and odd jobs. Yet, no action was ever taken against these male colleagues.

4.63   Likewise, UTT's report on Plaintiff's alleged academic misconduct concludes that Plaintiff should be disciplined and/or terminated for contacting students by Facebook, even though there is no university policy that prohibits this widespread practice by all of the professors at UTT. This is a necessary job function as today's students come to college having been trained to contact their instructors through Facebook. Stadelmann had approved Plaintiff's use of Facebook to interact with students. The University President had also praised Plaintiff's use of Facebook to interact with students. The university has recently held a workshop to encourage all faculty to utilize social media to improve student learning. Yet, the latest report now proposes that Plaintiff be punished for this conduct even though male professors regularly use Facebook without consequence.

4.64   Defendant's report and findings regarding academic misconduct also demonstrates Defendant's intent to discriminate against Plaintiff because of her disability. Specifically, the report takes issue with the number of classes that Plaintiff has missed. This disregards the fact that Plaintiff has never exceeded her allotted sick days each year and currently has approximately 30 unused sick days in the bank.

4. 65   UTT has always known that Plaintiff is disabled and suffers from a chronic and permanent respiratory illness that qualifies as a disability under the ADA. Even though UTT had previously accommodated Plaintiff's disability for years by giving Plaintiff preferential classroom assignments, allowing her to teach online, and exempting her from certain events including commencement exercises,  UTT's report proposed disciplinary action against Plaintiff for her attendance which is directly related to Plaintiff's disability and which Defendant had previously accommodated prior to Plaintiff's complaint of discrimination.

4.66   Defendant's report calls these absences "unprofessional" and a reason for discipline or termination.  Plaintiff received no prior notice of this change in position, which suggests that defendant no longer wishes to accommodate Plaintiff's medical condition.

4.67.   Defendant's investigative and accompanying disciplinary process has taken over 25 months to complete are clearly a prelude to UTT's predetermined intention to revoke Plaintiff's tenure and terminate her employment.

4.68   Defendant's aforementioned actions, namely placing Plaintiff on mandatory leave, denying her access to the University, unreasonably delaying the conclusion of this investigation, and issuing findings which go far beyond the original charges, constitute an ongoing pattern of discrimination and retaliation in response to Plaintiff's protected activity under Title VII and Chapter 21 of the Texas Labor Code.

4.69   While Defendant continues to work towards accomplishing this goal in defiance of Title VII, Chapter 21 of the Texas Labor Code and AAUP scrutiny, Plaintiff desperately seeks to return to her former tenure status, to continue to perform the work she loves, and to have the discrimination stop.

**Plaintiff's Second Amended Complaint**                                              **Page 22**

4.70    Plaintiff's employment and academic reputation still remain in suspense.  Although the restrictions to the administrative leave have been lifted, the duration of these restrictions have had the intended effect of exiling Plaintiff from her academic home and cutting her off from her colleagues and research. Plaintiff was recently determined to be ineligible to pursue certain teaching opportunities in the fall of 2016 as a direct result of this 25 month suspension.

4.71    Plaintiff has recently been made the subject of a second Title IX investigation during her first seven weeks back from her imposed leave of absence.   This latest investigation is purportedly to investigate student reports of discrimination by Plaintiff. Plaintiff has not received any charges and has fully cooperated with the investigatory process. Plaintiff has been notified that these charges could result in further disciplinary action, which in light of the Provost's previous discipline places her current tenure in further jeopardy. Plaintiff does not believe there is any merit to these charges, and therefore believes that she has been subjected to this investigatory process in further retaliation for her protected activity.

4.72    There are multiple performance reviews and student evaluations, which both of UTT's reports ignore, even though the reviews and evaluations show that Plaintiff was a gifted teacher and a great resource to UTT.  Yet, because Plaintiff protested and reported her reasonable belief that she was a victim of gender discrimination in the College, UTT has treated her punitively and through its proposed disciplinary action, has suspended Plaintiff for one semester without pay and has also placed her on indefinite probation.  In doing so, Defendant has potentially jeopardized her earned tenure.   Going forward, Plaintiff's future employment is now under the sole supervision of Stadelmann, who Plaintiff reasonably believes to have been the architect of the student complaints and the subject of a Title VII complaint. Stadelmann's bias against Plaintiff is on record wherein he

stated that Plaintiff should not be employed at UTT. Yet, Defendant appointed this individual to be in charge of Plaintiff future employment.

4.73    UTT took far longer than what it is allowed under its own procedures and policies to investigate the original charges against Plaintiff. This deliberate delay in the investigation was clearly in retaliation against Plaintiff for raising her complaints of sex discrimination and thereafter filing a charge with the EEOC.

4.74    UTT's opening of a second investigation based upon a re-weighting of grades was done in willful disregard of her internal Title VII complaint and subsequent charge of discrimination and retaliation to the EEOC.

4.75    As a result of Defendant's willful discriminatory and retaliatory conduct, Plaintiff has not only suffered monetary damages, but continues to suffer extreme mental anguish, emotional distress, loss of sleep, and further deterioration of her health. Plaintiff continues to suffer lost opportunities for further compensation and continues to suffer further damage to her professional reputation, since the general perception from Plaintiff's colleagues and students is that she has already been terminated from UTT for misconduct. Plaintiff further believes that the deterioration of her medical condition is a direct consequence of the undue stress caused by the Defendant's actions.

4.76    On February 19, 2016, Plaintiff filed the instant complaint in the US district Court. As a courtesy, Plaintiff through her counsel notified UTT's in-house counsel that the complaint had been filed and furnished a courtesy copy to UTT's in-house counsel. Defendant's in-house counsel acknowledged receipt of the complaint on February 20, 2016.

4.77    On February 23, 2016, two business days later, Defendant issued the following "recommendations" for discipline to Plaintiff for the alleged Title IX charges and charges of

Academic misconduct. Defendant's recommended disciplinary action was as follows:

a.   Plaintiff must attend an adequate number of training sessions as prescribed and approved by the University Human Resources on the topics of gender-based sexual discrimination and sexual misconduct/sexual harassment;

b.   Plaintiff must attend an adequate number of training sessions as prescribed and approved by Human Resources on the topics of rules and practices relating to course syllabi, the family educational rights and privacy act (FERPA), appropriate conduct with and use of graduate assistants and professional decorum;

c.   Plaintiff must serve one full semester on unpaid administrative leave before returning to the faculty and upon [her] return; and

d.   Plaintiff must work closely under the supervision of the department chair to better understand proper academic conduct and to avoid recurrence of inappropriate actions.

4.78   Sub-Parts (a) and (b) of Defendant's disciplinary recommendation do not define what is an adequate number of training sessions. Nor do they identify with any specificity what topics are to be discussed, how the training will be administered or when this training will be concluded.

4.79   The net effect of this proposed disciplinary action has damaged Plaintiff professionally and financially. It also serves the purpose of further extending Plaintiff's leave of absence by an additional four months.

4.80   The proposed unpaid administrative leave will result in Plaintiff's being absent from the Department for over two and a half academic years. Plaintiff has already been on administrative leave for over 25 months. The additional forced time off is punitive and retaliatory.

4.81   By placing Plaintiff under the strict supervision of the Department Chair, Plaintiff will be force to report to the same individual, who was the subject of her complaint of gender discrimination. The imposition of such strict scrutiny by this individual essentially threatens Plaintiff earned tenure, especially in light of the fact that he has already gone on record with his opposition to retaining Plaintiff in any capacity.

4.82    At the same time that Defendant issued its proposed disciplinary recommendations, Defendant also issued a Reply to Plaintiffs counsel's correspondence dated January 19, 2016 which raised certain evidentiary issues and objections to the initial report dated December 21, 2015.

4.83    The timing of Defendant's delivery of the Reply and proposed disciplinary recommendations two days after the original complaint was filed is further evidence of Defendant's retaliatory conduct and is clearly intended to punish Plaintiff for engaging in the protected activity of pursuing what she reasonably believed was unlawful discrimination.

4.84    Defendant's Reply dated January 19, 2016, was not delivered to Plaintiff until February 23, 2016, at the same time as the recommended disciplinary action. Defendant's Reply accuses Plaintiff of engaging in stall tactics when, in fact, Plaintiff was seeking medical treatment for a respiratory ailment and exercised her protected rights under Title VII.

4.85    Defendant's Reply dated January 22, 2016, accuses Plaintiff of beginning a series of activities that Defendant characterizes as "stall tactics." Defendant cites as examples of Plaintiff's stall tactics her filing a counter claim of sex discrimination and exercising her rights under the FMLA.

4.86    Plaintiff's filing a complaint of sex discrimination and requesting FMLA leave for a serious medical condition are both protected activities under Title VII and the FMLA respectively. UTT's characterization of Plaintiff's protected activities as stall tactics falsely suggests that Plaintiff made these claims to delay UTT from promptly investigating the charges against Plaintiff. This is not only false, but strongly indicates UTT's retaliatory motive against Plaintiff for her protected activities. Defendant has clearly factored Plaintiff's protected activity in its disciplinary action, which has been left open-ended in order to subject Plaintiff to further disciplinary action up to and

including dismissal.  This poses a serious and permanent threat to Plaintiff's tenured status.

4.87   Under the terms of the proposed discipline, Plaintiff's tenured status remains in jeopardy. The latest investigation without proper notice of what charges prompted the same, serve only to further threaten Plaintiff's tenured status. This has caused Plaintiff of to suffer further emotional distress and has adversely affected the terms and conditions of her employment.

**V.**

**CAUSES OF ACTION**

**First Count**

**Sex Discrimination In Violation of 42 U.S.C. § 2000 e**

5.01   The foregoing paragraphs of this Complaint are incorporated in this Count by reference as if set forth at length herein verbatim.

5.02   Defendant has discriminated against Plaintiff by subjecting her to discrimination because of her sex with respect to the terms and conditions of her employment by treating Plaintiff differently during her employment, and by placing Plaintiff on indefinite leave and depriving Plaintiff of all communication with University knowing that such an imposition necessarily damages the terms and conditions of her employment. Defendant retaliated against Plaintiff after she complained about sex discrimination in the terms and conditions of her employment, so that Defendant thereby intentionally engaged in unlawful employment practices prohibited by 42 U.S.C. § 2000e *et seq.*

5.03   The acts of sexual bias and favoritism described above, which occurred more than 300 days prior to the filing of the charge, although not the only action, demonstrate that a historic pattern of sexual bias that has manifested itself in the form of mishandling Plaintiff's complaint of

discrimination, the disciplinary charges and a restrictive leave of absence was placed upon the Plaintiff. Moreover, there is evidence that at least several other male faculty members and administrators were accused of harassment and stalking female professors and students, but were neither investigated nor disciplined in the same manner in which Plaintiff has been treated.

5.04    All conditions precedent to filing this action for discrimination under federal law have been met. Plaintiff timely filed her charge of discrimination on the basis of sex. Plaintiff received a Notice of Right to Sue within the 90 days prior to filing this lawsuit. Plaintiff's amended complaint has been filed pursuant to the Order of the court dated March 7, 2017 and is timely under the most recently issued Notice of Right to Sue that was issued following the filing of her second EEOC charge.

5.05    Defendant has engaged in a single continuous course of conduct of discrimination against Plaintiff because of sex with the intent destroy Plaintiff's career, and cause her to suffer financial damages.

5.06    Such discrimination by Defendant against Plaintiff was intentional. Accordingly, Plaintiff is entitled to recover damages from Defendant for back pay, front pay, future pecuniary losses, emotional pain and suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Further, this discrimination was done by Defendant with intentional malice or with reckless indifference to Plaintiff's protected rights. Such discrimination constitutes gross, wanton, reckless, and/or intentional violation of Plaintiff's rights under Title VII. Plaintiff is therefore also entitled to recover punitive damages in a sum which is in excess of the minimum jurisdictional limit of this Court. Plaintiff is also entitled to recover all costs of court and attorneys' fees.

# VI.

## Second Count

## Sex Discrimination In Violation of Chapter 21 of Texas Labor Code

6.01     The foregoing paragraphs of this Petition are incorporated in this Count by reference as if set forth at length herein.

6.02     Defendant UTT employs at least fifteen (15) employees and is an employer within the meaning of the Texas Human Rights Act.

6.03     Conditions precedent to filing this action for discrimination under Texas state law have been met.  Plaintiff timely filed her charge of discrimination on the basis of sex with the Texas Commission on Human Rights.  Plaintiff filed the instant action more than 180 days after the filing of the charge.

6.04     Defendant UTT has violated the Texas Human Rights Act, Texas Labor Code §21.001 *et seq*, by discharging Plaintiff and/or discriminating against Plaintiff in connection with compensation, terms, and conditions or privileges of employment because of Plaintiff's sex. Defendant, UTT has engaged in a single continuous course of conduct of discrimination against Plaintiff because of sex in order to destroy Plaintiff, her career, and her personal life.

6.05     Such discrimination by UTT against Plaintiff was intentional.  Accordingly, Plaintiff is entitled to recover damages from UTT for lost wages from teaching opportunities that Plaintiff could have otherwise performed but for her mandatory administrative leave, front pay, promotional opportunities for which she would have been otherwise eligible  past and future pecuniary losses, emotional pain and suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Further, this discrimination was done by Defendant with malice or with reckless indifference

to Plaintiff's state-protected rights. Plaintiff therefore is also entitled to recover punitive damages in a sum which is in excess of the minimum jurisdictional limit of this Court. Plaintiff is also entitled to recover all costs of court, attorneys' fees, and expert fees as allowed by Texas Labor Code Ann. §21.259.**VII.**

## VII.

### Third Count

### Retaliation under 42 U.S.C. § 2000e

7.01     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs and incorporates the same as if set forth herein at length.

7.02     Plaintiff is an employee within the meaning of Title VII.

7.03     Defendant is an employer within the meaning of Title VII.  42 U.S.C. § 2000e(b).

7.04     Plaintiff timely filed with the Equal Employment Opportunity Commission and the Texas Human Rights Commission a charge of discrimination for retaliation against Defendant on or about March 9, 2015.  Plaintiff received Notices of the Right to Sue from the E.E.O.C. within ninety (90) days of the filing of this Complaint.  A copy of the Notices of the Right to Sue letter are attached hereto as Exhibit B and D.

7.05     As a result of Defendants' unlawful employment practices, Plaintiff has suffered damages including lost wages, front pay, past and future pecuniary losses, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses, and seeks to recover for those sums.

7.06     Defendant's action in taking retaliation against the Plaintiff for her complaints about discriminatory treatment and unlawful employment practices was intentional, willful and malicious

so that Plaintiff is entitled to recovery of exemplary damages.

## VIII.

### Fourth Count

### Attorneys' Fees

8.01    Plaintiff incorporates the foregoing paragraphs of this Complaint as if set forth at length verbatim.

8.02    The preparation and filing of this Complaint has necessitated the hiring of attorneys. Plaintiff seeks to recover reasonable and necessary attorneys' fees as allowed by Title VII and the Texas Human Rights Act.

## IX.

### JURY TRIAL DEMANDED

9.01    Plaintiff demands trial by a jury of all claims as allowed by statute and common law.

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendants be cited to appear and answer herein and that upon final trial Plaintiff have and recover the following relief against Defendants:

1)    Judgment for actual damages in the amount of past and future lost earnings and benefits and damages to past and future earnings capacity and past and future medical counseling expenses;

2)    Judgment for back pay and front pay as allowed by law, including lost bonuses and promotions;

3)    Judgment for past and future pecuniary losses, emotional pain and suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses;

4)    Damages for past and future mental anguish, emotional distress, and physical distress;

5)    Reinstatement to full tenured position with full seniority;

6)    Exemplary damages in an amount to be determined by the trier of fact;

7)    Prejudgment and post-judgment interest at the maximum legal rate;

8)      Attorneys' fees;

9)      Expert fees;

10)     All costs of court; and

11)     Such other and further relief to which Plaintiff may be justly entitled.

Date: March 20, 2017

Respectfully submitted,

KILGORE & KILGORE, PLLC


By:/s/ Nicholas A. O'Kelly
    Nicholas A. O'Kelly
    State Bar No. 15241235
    nao@kilgorelaw.com

3109 Carlisle Street, Suite 200
Dallas, TX 75204
(214) 969-9099 - Telephone
(214) 953-0133 - Fax

ATTORNEYS FOR PLAINTIFF
MARY LINEHAN

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was sent on this 20th day of March, 2017, via ECF to:

Esteban S.M. Soto
Assistant Attorney General
General Litigation Division
Office of the Attorney General
300 West 15th Street
Austin, TX 78701
Phone: 512-475-4054
Fax: 512-320-0667
Esteban.Soto@texasattorneygeneral.gov

/s/ Nicholas A. O'Kelly
Nicholas A. O'Kelly