# REPORT ON ALLEGATIONS OF SEXUAL DISCRIMINATION BASED ON GENDER AND SEXUAL MISCONDUCT/SEXUAL HARASSMENT AGAINST DR. MARY LINEHAN



Submitted By
Ona Tolliver, Dean of Students
December 18, 2015



EXHIBIT

E

UTT_001073

# I.

## EXECUTIVE SUMMARY

On April 24, 2014, the Dean of Students Office at The University of Texas at Tyler ("UT Tyler") was notified by Dr. Marcus Stadelmann, Chair of History and Political Science, of potential violations of the Title IX of the Education Amendments of 1972 ("Title IX") involving several students and faculty member Dr. Mary Linehan, Associate Professor, Department of History ("Dr. Linehan" or "Respondent").

Ona Tolliver, Dean of Students met with Complainant 1, Dr. Marcus Stadelmann and Dr. Patricia Gajda, Professors in the Department of History, to discuss the student's complaints. Complainant 1 was enrolled in Dr. Mary Linehan's History 5388.001 course (HIST 5388) during the spring 2014 semester. Complainant 1 alleged that Dr. Linehan referred to her as a "slut" or a "prostitute" during the semester. She also alleged that Dr. Linehan referred to her using these terms in other classes prior to the spring 2014 semester. Complainant 1 confirmed that she was the author of an anonymous letter received by Dr. Stadelmann in March 2014 outlining her complaints. Finally, the student also expressed concerns regarding Dr. Linehan's professionalism and unfair treatment of other students.

The Dean of Students also met with Complainant 3, another student in Respondent's HIST 5388 course. Complainant 3, also filed a complaint indicating that the Respondent used inappropriate language when referring to Complainant 1. Complainant 3 also stated that she felt harassed and intimidated by Respondent and that she also feared that the Respondent would retaliate if she brought forth her complaints. Complainant 3 also detailed her complaints as they pertain to her academic experiences with Respondent (addressed in a separate report by Dean Slann).

The Dean of Students also learned during the course of the investigation that other students in Respondent's HIST 5388 course had similar complaints regarding Respondent's use of inappropriate language and that Respondent exhibited gender bias, specifically directed towards or about males.

The investigation also revealed two former students who allegedly had similar experiences with Respondent (Witness 1 and Witness 3).

Based on the foregoing verbal complaints, on May 5, 2014 in accordance with Title IX and UT Tyler's Handbook of Operating Procedures (HOP) 2.4.3, *Sexual Harassment Complaint, Investigation, and Grievance Procedures and Responsibilities,* and HOP 2.4.1, *Nondiscrimination Policy and Complaint Procedure,* the Dean of Students Office began its investigation of those complaints.

Although Witness 1 and Witness 3 were not a part of the 2014 complaint their experiences as former students of Respondent support the claim that a pattern of behavior existed prior to 2014. The information also corroborates the perception of intimidation, differential treatment of

2

individuals based on gender, unprofessional behavior and the existence of a possible hostile environment.

Respondent alleges that the statements presented to her regarding the student complaints are irregular due to their similar nature. Due to the similar nature of the complaints submitted by each student, the Dean of Students provided each with a summary, requesting confirmation of their complaints and expected outcomes. The terminology, complaints and experiences dictated the similarity in complaints as stated in the summary for each complainant.

Respondent takes issue with the fact that Complainant 2 never responded to the Dean of Students' request for written confirmation of her written complaint. However, Complainant 2 met personally with the Dean of Students regarding her complaint and indicated her desire to have her concerns addressed—which was done. Additionally, Complainant 2 communicated her concerns related to the Respondent's unprofessional behavior and academic concerns to the Chair of the Department, Dr. Marcus Stadelmann.  Thus, Complainant 2's complaints were clearly communicated and investigated.

As discussed in more detail in the following report, I find that the Complainant1 (and other students) were made to feel uncomfortable by Respondent's comments and behaviors—which were based on gender and were of a sexual nature. It is also my opinion that Respondent regularly used language that was inappropriate and unprofessional with regard to men which had the effect of demeaning male students. Multiple witness interviews, corroborating statements from Complainants and witnesses, audio recordings from the spring HIST 5388 class, and various other documents, the evidence shows that Respondent violated The University of Texas at Tyler HOP 2.4.4, *Sexual harassment by faculty, staff, or visitor* by engaging in inappropriate verbal conduct of a sexual nature inappropriate for the classroom.  Based on the documentation and witness corroboration Respondent is also found to have violated HOP 2.4.1, *Nondiscrimination Policy and Complaint Procedure* by engaging in conduct that discriminated against students based on gender. Further, Respondent's conduct, in the aggregate, created a hostile environment based on gender and a hostile environment where students feared retaliation for making complaints.  Respondent also engaged in a pattern and practice of unprofessional and inappropriate conduct with students. Respondent created an environment where students were limited in their ability to participate in or benefit from UT Tyler's educational program on the basis of gender.  Based on the violations of policy, I recommend that the Provost and Vice President for Academic Affairs consider taking disciplinary action, up to and including termination, against Respondent.

## II.
## APPLICABLE POLICIES

### A.  HOP 2.4.1

UT Tyler's Handbook of Operating Procedures (HOP), Section 2.4.1, *Nondiscrimination Policy and Complaint Procedure* (Nondiscrimination Policy), provides the following definitions:

3

- **Discrimination,** including harassment, is defined as conduct directed at a specific individual or a group of identifiable individuals that subjects the individual or group to treatment that adversely affects their employment or education on account of race, color, national origin, religion, *sex*, sexual orientation, age, veteran status, or disability. (Emphasis added).

- **Harassment,** as a form of discrimination, is defined as verbal or physical conduct that is directed at an individual or group because of disability, sex, age, race, color, national origin, religion, citizenship, veteran status, or sexual orientation when such conduct is sufficiently severe, pervasive or persistent so as to substantially interfere with an individual's or group's academic or work performance; or of creating a hostile academic or work environment. Constitutionally protected expression cannot be considered harassment under the policy.

## B. HOP 2.4.4

UT Tyler's HOP, Section HOP 2.4.4, *Sexual Harassment by Faculty, Staff, or Visitor* (Sexual Harassment Policy), provides the following definitions:

- **Sexual Misconduct:** Sexual misconduct includes unwelcome sexual advances, requests for sexual favors, *or verbal or physical conduct of a sexual nature* directed towards another individual that does not rise to the level of sexual harassment but is unprofessional and inappropriate for the workplace or classroom. (Emphasis added)

- **Sexual Harassment:** Sexual harassment includes:

a. Any criminal offense under the Texas Penal Code of a sexual nature, including rape, sexual assault, sexual battery, assault, sexual coercion, or other acts of sexual violence; and

b. Unwelcome sexual advances, requests for sexual favors, or verbal or physical conduct of a sexual nature when:

   i. Submission to such conduct is made either explicitly or implicitly a term or condition of employment or student status; or
   ii. Submission to or rejection of such conduct is used as a basis for evaluation in making personnel or academic decisions affecting that individual; or
   iii. Such conduct has the purpose of effect or unreasonably interfering with an individual's performance as an administrator, faculty member, staff or student, or creating an intimidating, hostile, or offensive environment

4

## III.
## ALLEGATIONS

The complainants, have alleged that a Respondent verbally harassed and or used harassing language when addressing students. Complainants also allege that the Respondent discriminated individuals based on gender.

A summary of specific allegations includes:

- Respondent made comments of a sexual nature, referring to a student as a "slut" "prostitute" or a "whore" and other comments of a sexual nature
- Respondent exhibited inappropriate treatment based on gender including referring to a male student as "she" or "her" and in conducting the "Mr. Women's History Pageant"
- Respondent created an environment where males felt intimidated and uncomfortable by making negative comments about men and discussing their academic performance.
- Respondent made comments regarding students' personal attire (both males and females) thereby allegedly creating an uncomfortable environment
- Respondent behaved unprofessionally such as: 1) interacting with students in person and electronically in a manner not appropriate for a professor with a student; 2) directing students to participate in a non-academic Facebook page "HOTties"; and 3) discussing her personal life with students
- Respondent created a hostile environment where students feared retaliation

## IV.
## PERSONS INTERVIEWED

The following persons were interviewed.

1. Complainant 1 – Graduate student, History (May 6, 2014)
2. Complainant 2 – Graduate student, History (May 5, 2014)
3. Complainant 3 – Graduate student, History (May 6, 2014)
4. Complainant 4 – Graduate student, History (May 6, 2014)
5. Complainant 5 – Graduate student, History (May 7, 2014)
6. Witness 1– Former student, (on May 6, 2014) and (June 6, 2014)
7. Witness 2 – Student (June 20, 2014)
8. Witness 3 – Former student (on July 21, 2014) and via email (August 6, 7 11, 2014)
9. Witness 4 – Graduate student, History (June 25, 2014)
10. Witness 5 – Staff, Graduate School (July 22, 2014)
11. Witness 6 – Staff, and former faculty, Academic Affairs (August 4, 2014)
12. Respondent – Faculty, History, (May 6, 2015)
13. Witness 7 – Graduate student (May 12, 2015)

UTT_001077

# V.
## DOCUMENTS PROVIDED AND REVIEWED

The following documents were provided and reviewed.

1. Written statement from Complainant 1 on May, 20, 2014
2. Written statement from Complainant 4 on May 20, 2014
3. Written statement from Complainant 2, request sent May 20, 2014 and May 28, 2014
4. Written statement from Complainant 3 on May 30, 2014
5. Written statement from Complainant 5 on May 21, 2014
6. Written response from Respondent dated June 17, 2014 (and received on June 20, 2014) (including individual responses to each complaints' written statement)
7. Supplemental written response from Respondent's legal counsel dated June 19, 2014
8. "Anonymous" Letter submitted to the Chair of History, Dr. Marcus Stadelmann, in March 2014 (Confirmed to be from Complainant 1)
9. Email correspondence between Complainant 1 and Complainant 2 to Dr. Marcus Stadelmann dated April 21, 2014 and March 26-27, 2014 respectively
10. Email correspondence between Witness 4, and Dr. Marcus Stadelmann dated April 21, 2014
11. Email correspondence between History Student 6, dated April 20, 2014 and Student 7 dated April 20, 2014
12. Facebook correspondence between Complainant 4 and Respondent dated September 22, 2011 thru November 7, 2012, resuming April 12, 2013 and potentially January 24 – March 17 believed to be 2014
13. Email correspondence between Complainant 4 and Respondent dated September 25, 2012
14. Blackboard post to all students in HIST 4387.001, spring 2012 by Respondent dated April 18, 2012 believed to be posts made on Blackboard or Facebook
15. Correspondence between Witness 3 and Respondent (via email) August 2010 thru November 2010
16. Email correspondence between Respondent and Dr. Marcus Stadelmann during the spring 2014 semester related to History 5388.001 and various students
17. Audio recording of the History 5388.001 classes, Spring 2014 and recorded by Student 8
18. May 8, 2012 Written Warning from Dean Slann to Respondent
19. Email correspondence between Dr. Marcus Stadelmann and Student 6 dated April 1-4, 2014
20. September 4, 2014 Report regarding the investigation of Respondent's discrimination complaint (prepared by UT Tyler's Office of Human Resources)
21. Response from Respondent, submitted on June 17, 2014 as part of the Office of Human Resources' investigation of Respondent's discrimination complaints
22. Investigator notes

UTT_001078

# VI.
## FACTUAL FINDINGS

### A. Allegation 1 - Respondent made comments of a sexual nature, referring to a student as a "slut" "prostitute" or a "whore" and other comments of a sexual nature

In this section I discuss the evidence and findings related to Dr. Linehan's alleged comments of a sexual nature.

> 1. Evidence in support of the conclusion that Dr. Linehan used language of sexual nature

> > a.   Respondent referred to a student as a "slut", "prostitute", or a "whore"

Complainant 1 stated that Respondent first referred to her as a slut, prostitute or a whore during a course in or about 2012. Complainant 1 states that she continued to refer to her by these names in every course she has taken with Respondent (which was a total of eight courses).  Respondent often introduced Complainant 1 using one of those terms without explanation to the class regarding its origin. Complainant 1 and Respondent both provided context for the original use of the term indicating it was related to the subject matter being covered in 2012 course. Specifically, Respondent used the example of women in history resorting to prostitution if they became pregnant and placed Complainant 1 in that role for the purpose of the example. Complainant 1 stated that Respondent continued to introduce her or make reference to her using some variation of those terms in subsequent semesters. Complaint 1 stated that she did not take the comment seriously but felt a need to explain the use of terms to her classmates each time she was introduced by Respondent in this manner.

The recording and witness testimony confirm Complainant 1's allegation that the terms were introduced by Respondent (not Complainant 1). Complainant 1 indicates that she became increasingly more uncomfortable by the statement and that she also sensed that her classmates were uncomfortable.  Complainant 3 stated that she felt Complainant 1 was afraid to come forward regarding her concerns because she was "scared" of Respondent. Complainant 1 originally submitted her complaint to the department anonymously; but she confirmed during her interview that the concern submitted during the spring 2014 semester was submitted by her.   When I interviewed Complainant 1, I believed that she was genuinely wary and embarrassed by the continued use of the terms "slut" and or "prostitute". It is my belief that the perceived treatment of students (unfair grading, public discussions about a specific student's academic status) who came forward to complain about the academic issues in the spring 2014 semester impacted Complainant 1's decision to submit her initial complaint anonymously. I believe she was fearful of being personally embarrassed by Respondent.

All Complainants confirmed that they heard Respondent refer to Complainant 1 during the spring 2014 course as a slut, prostitute or a whore. At least two witnesses, Complainant 4 and Complainant 3, have been in numerous classes with Complainant 1 and Respondent and both confirmed that the language was used in previous courses. Complainant 1 states that she became aware that other students within the Department were aware of the comments made related to her.

UTT_001079

Respondent stated that she did not refer to Complainant 1 using any of those terms beyond the initial class activity in 2012. She stated that she only used the term in order to inform the class of the nature of the language only after Complainant 1's used the terms. Respondent stated that she did not refer to Complainant 1 specifically as a "slut" or a "slutty girl". The Respondent explained that on February 9, 2012 during a Women's History course the class discussed *Le Miserables,* Complainant 1 agreed to play act the lead role. Complainant 1 portrayed the role of the heroine who had to turn to prostitution which was the only way she could support her child. When asked if she used those terms more than once during a course she stated "only to clarify Complainant 1's statements, yes".  Respondent clarified by stating that in subsequent semesters (following 2-12) Complainant 1 would refer to herself as the "unwed slut" and that she would explain the circumstances to each class. Respondent stated that Complainant 1 brought up the reference to herself in every course she took with her and that Complainant 1 posted it on Facebook. When asked about the context under which Complainant 1 would broach the subject Respondent stated that she did not know, but recalled Complainant 1 stating that "Fantine", the heroine in Le Miserables was her favorite character.  Respondent was also asked if she had ever referred to Complainant 1 using those terms after 2012 she again stated that only when she needed to clarify the statement to other students. Although the initial example and demonstration utilized in 2012 may have been appropriate for the applicability of the course material it is my opinion that the use of the term "slut" or "prostitute" beyond this class constitutes sexual misconduct.

Respondent states in her response that Complainant 1 referred to herself in this manner and that Complainant 1 has taken the "lead" in using those terms when referring to herself. Respondent stated that she often had to provide explanation or context to the class when Complainant 1 introduced herself.

Further Respondent indicated in her written response that "'slut' is a highly contested word in our culture and one that I would not use". The respondent denied ever referring to a student as: "slut", "slutty girl" or "whore" when asked during her interview. The Respondent is heard during the first class referring to Complainant 1 as "slutty girl".

During the first class of HIST 5388 course (audio recording), Respondent is heard referring to Complainant 1 as "slutty girl". Complainant 1 is also heard vocalizing her discomfort with the comment. Respondent comments "see it does bother you" (Respondent is heard laughing).

   b.  Comments of a sexual nature

In relation to Respondent making inappropriate comments of a sexual nature Student 6 submitted a complaint to Dr. Stadelmann in April 2014 expressing concerns regarding the Respondent's comment via Facebook stating that her son's name, ▮▮▮▮▮▮▮ means "big penis". The exchange was presented as a screen capture which included a profile picture/graphic of "Captain Crunch". The student refers to the individual in the exchange as Dr. L. and in other electronic exchanges between Dr. Linehan and students the "Captain Crunch" profile picture/graphic identifies the user as Dr. Mary Linehan. This evidence supports the allegation that Dr. Linehan referred to Student 6's son using the term.

8

Based on the foregoing evidence, I find that Respondent did make comments of a sexual nature, referring to a student, Complainant 1, as a "slut" "prostitute" or a "whore" during a course for which the language was not germane to the subject matter being presented. Regarding the comments related to ▮▮▮▮▮, it is more likely than not that the exchange between Student 6 and Dr. Linehan occurred and that she made the comments.

**B. Allegation 2 - Respondent exhibited inappropriate treatment based on gender including referring to a male student as "she" or "her" and in conducting the "Mr. Women's History Pageant"**

In this section I will discuss the evidence and findings related to Dr. Linehan's alleged treatment based on gender.

    1. Evidence in support of the conclusion that Dr. Linehan exhibited inappropriate treatment based on gender

        a. Respondent made unusual comments about students' attire

Several witnesses stated that Respondent referred to a male student in HIST 5388 as "she", or "her" after noticing that the male student (Witness 4) was wearing a "flip-flop" style of shoe. Witness 4 recalled Respondent making comments about attire, specifically about his feet while he was wearing "flip-flops". Witness 4 stated that he took the comment as a joke and was not offended. As discussed below, in Section VII. D. similar comments about personal attire were also made by the Respondent towards females. Respondent stated that she did not single anyone out regarding footwear; that she did not like "anyone" wearing flip flops in general, multiple witness indicated that she addressed both men's and women's footwear. Respondent also stated that she did not recall referring to a male student as "she" or "her".

        b. Respondent conducted the "Mr. Women's History Pageant"

Witness 3 confirmed that he participated in the Mr. Women's History Pageant during the spring 2010 semester and that the winner was given a feather boa to wear during the class. He recalled Respondent making a statement that she should have brought her "tampons", as an award for the winner. Witness 3 also indicated that the male student participants were asked to answer "sensitive" questions that he felt were meant to put the male students in touch with their "other genetic side". Based on the demeanor of the witness during the interview and his responses to questions related to his experiences with the Respondent, I believe that he felt demeaned by activity.

Witness 5 indicated that she had met with Witness 3 while he was a student sometime in 2010. Witness 3 stated that he expressed concern regarding Respondent's actions. Witness 5 recalled Witness 3 stating that during one of his courses he had to participate in a fashion show for males only. Witness 3 told her that Respondent made a statement to the effect "she wished she had brought her tampons so she could have given the men tampons as prizes". Witness 5 stated that Witness 3 stated that Respondent "treated men different".

9

Respondent confirmed that she had conducted the Mr. Women's History Pageant at UT Tyler four times. Respondent admitted to holding this pageant but stated that the contest was a pedagogical technique utilizing questions that are things only women would know. She also stated that since she has been at UT Tyler she did not award tampons but a mirror, Cosmo magazine, body or hand lotion to the male students. When the subject of the contest was addressed by Dr. Ken Wink, Interim Dean, Respondent stated that she did not stop utilizing the contest because he did not tell her to stop the activity. The "Mr. Women's History" contest is also discussed in the Gender Discrimination report as submitted by Mrs. Amy Clem, ad interim Executive Director of Human Resources, September 5, 2014.

Based on the testimony of all witnesses, I find that Respondent engaged in inappropriate treatment of males by requiring male students to participate in a Mr. Women's History Pageant and that prizes that were feminine in nature (such as mirrors, women's magazines, lotions) were awarded to the male students. I also find that the effect of this contest was to demean male students because, as discussed below in Section VII. C., Respondent's expressed view of men is negative (i.e., she thinks "men are pathetic.") Also, based on her negative view of men and the feminine nature of the prizes given to males who participated in this contest, I find that it is more likely than not that Respondent made a statement about wishing she had brought her tampons so she could have given the men contestants tampons as prizes.

Although unusual, I found that the Respondent's comments in general about "flip-flops" were not based on gender because, as stated below in Section D, these comments based on personal attire were made to both males and females and did not discriminate against students based on gender. I found that other comments related to her personal opinion of men in concert with her reference to a male student wearing "flip-flops" as "she" or "her" were based on gender.

### C. Allegation 3 - Respondent created an environment where males felt intimidated and uncomfortable by making negative comments about men and discussing their academic performance.

In this section I will discuss the evidence and findings related to Dr. Linehan's comments specific to men.

> 1. Evidence in support of the conclusion that Dr. Linehan created an environment where males felt intimidated and uncomfortable
>
> a. Respondent made negative comments about men

Respondent is heard making comments on the HIST 5388 audio recording such as, "Discuss that later when I talk about things that upset me...men would be number one" and "men are weird...pathetic". Respondent stated that she was not aware of the statement and that she never told students that "men are pathetic".

UTT_001082

Complainant 5 recalled an incident during the spring 2014 semester where Respondent requested that he guest lecture for one of her courses. Due to a number of issues and miscommunications, Complainant 5 was unable to guest lecture. Respondent sent a student (Witness 2) to the History department to ask Complainant 5 to come to her class. Upon returning Witness 2 informed Respondent that Complainant 5 was unavailable and Respondent responded to Witness 2 that Complainant 5 was an "ass." Witness 2 made Complainant 5 aware of this incident. Both witnesses corroborated this statement when interviewed.

Respondent referred to a male student as "she" or "her" after observing the student (Witness 4) wearing "flip-flops". Witness 4 stated that he took the comment regarding his footwear as a joke and was not offended.

Complainant 5 stated that Respondent acts "very sexist" towards males in class.  Providing the example: Respondent makes comments in class about any given subject matter and then stating "why do men act this way." Complainant 5 also recalled Respondent making similar statements to males in previous classes.

Witness 1 recalled Respondent stating that "you are worthless being a guy, you should be a girl". He also stated that she would "hate on you" for being a guy.

      b.   Respondent discussed the academic performance of male students

Complainant 4 stated that she was asked during a previous semester to "talk" to the men and let them know that it was okay to take her class. Complainant 4 also provided copies of a November 17, 2011 email exchange between herself and Respondent where Respondent asks Complainant 4 "could you please post there that I do not hate men." Other email exchanges were also provided by Complainant 4 reflecting Respondent discussing the "rumor" that men will not succeed in her class and the individuals who have spread this "rumor". Respondent denied that she asked a student to communicate that she did not grade males more harshly.

Complainant 2 stated that Respondent made comments to the effect that male students would not receive an "A" grade in class, "if anyone got an A it would be a girl".

Witness 2 stated that she was aware that males would not take a class from Respondent because she would "belittle" them. Respondent stated that she found it hard to believe that students would feel belittled by her.

Complainant 5, and Witness 1 indicated that Respondent would "put down" males who participated in class, that she graded males more harshly. Respondent stated that she grades all students equally. No evidence was provided to support the claim that the Respondent graded males more harshly.

Witness 3 indicated that Respondent made him feel obligated to her because she placed him in an adjunct position. He also stated that he felt she would retaliate against him or prevent him from achieving graduation if he went against her wishes.

11

 Regarding the allegation of whether Respondent graded males more harshly than females, no database exists wherein this information is readily discernible.

Based not only on the testimony of students but on the audio recording of HIST 5388, I find that it is more likely than not that Respondent made negative comments about students' gender (i.e., males) where she created an environment where male students felt intimidated and uncomfortable. I also find that documentary evidence shows that Respondent was aware that her conduct in the treatment of men was demeaning otherwise she would not have asked other students to talk to male students and let them know that it was okay to take her class. Finally, I find that it is more likely than not that she made the following statements (or similar statements) that had the effect of demeaning male students:

- "Why do men act this way."
- "Men are weird…pathetic."
- "You are worthless being a guy, you should be a girl."

## D. Allegation 4 - Respondent made comments regarding students' personal attire (both males and females) thereby allegedly creating an uncomfortable environment

This section will address the findings pertaining to the allegation that Dr. Linehan made comments regarding student's personal attire.

1. Evidence and findings regarding Respondents use of language pertaining to personal attire and gender

   a. Respondent made comments regarding students' personal attire

Multiple witnesses (males and females) indicated they had knowledge of Respondent's dislike of exposed feet and "flip-flops", that she made comments during several semesters regarding their footwear. Respondent provided a response indicating that she informed students of the origin of her dislike (i.e., a student who was injured as a result of wearing this style of shoe). Complainant 4 also stated that Respondent made comments related to "flip-flops" and how "disgusting people's feet are". Complainant 2 stated that Respondent referred to the "toe" thing throughout the semester and that the comments about this and attire "created an uncomfortable atmosphere".

Complainant 4 also indicated that Respondent made comments about an individual's personal attire, noting that Respondent had made several comments about Complainant 4 wearing "polo" style shirts that she began calling her "polo" which made her uncomfortable to the degree that she stopped wearing that style of shirt. Respondent stated that she never referred to a student as "Polo". Complainant 4 also stated that Respondent made comments related to "flip-flops" and how "disgusting people's feet are".

Based on the evidence, I do not find that Respondent made comments about students' personal attire that were based on gender or that were meant to discriminate based on gender. Thus, I find no policy violation.

12

**E. Allegation 5 - Respondent behaved unprofessionally such as: 1) interacting with students in person and electronically in a manner not appropriate for a professor with a student; 2) directing students to participate in a non-academic Facebook page "HOTties"; and 3) discussing her personal life with students**

This section will address the findings which support the allegation that Dr. Linehan behaved unprofessionally in a manner appropriate for a professor and student.

1. Evidence in support of the conclusion that Dr. Linehan interacted with students inappropriately

   a. Respondent interacted without appropriate boundaries with students in person and electronically

Multiple witnesses stated that they felt Respondent "stalked" them on Facebook by capturing personal photos and reposting those images without permission or sharing things she may have seen on their personal Facebook page that did not pertain to class. Respondent makes reference to Facebook during the HIST 5388 audio recording making statements such as: "that's because she's not my friend so I can't creep her and steal her pictures."; "I just stalk them on Facebook."; "I go through their pictures all the time and steal them." Notably, a student is heard responding "that's why I don't post pictures".

During the HIST 5388 recording, there appears to be a discussion about popular items posted on Facebook and that Respondent reviewed the site, several individuals are speaking at once about Facebook and Respondent states "It's fun and I can see all of your secret stuff." A student responded "And then she'll bring it up in class." Then Respondent responds "Yeah, that's always fun." Respondent stated that she did not recall making the comments. She stated that she did not "friend" students on Facebook unless they contacted her. She also indicated that the nature of Facebook allows access to individual's pages and that she did utilize their photos by reposting them without permission to the "HOTties" page.

Complainant 2 stated that she did not use Facebook for personal reasons and that she rarely shared personal information because she felt Respondent used personal information as "leverage" against students.

Complainant 5 stated that he "blocked" Respondent from his Facebook page after becoming aware of issues regarding other students, stating that she "harasses" people through messages on Facebook.

Witness 3 provided a copy of an email sent by Respondent to him, Dr. Tabri, Dr. Newsome and Dr. Gajda (faculty in the department) dated August 9-11, 2010 speculating as to whether "Dan"

UTT_001085

(faculty) was leaving the university and whether his house sold. Witness 3 was a student at the time of this correspondence which included faculty. Respondent stated that she did not include students in an email discussing department administration and faculty.

Witness 2 stated that she felt Respondent would "get too personal with the students," that there is a fine line between professor and friend and that she feels Respondent is trying to be both.

   2.  Evidence in support of the conclusion that Respondent used social media "HOTties", for academic purposes

      b.  Respondent directed students to participate in a non-academic Facebook page "HOTties"

Multiple witnesses stated that Respondent encouraged them to participate in the Historians of Tyler ("HOTties") Facebook page, a page that was not affiliated with UT Tyler. Complainant 2 stated that Respondent posted course information on this site. Witness 4 stated that he was confused by the site and originally thought it was an official channel of communication for the class but learned that it was an external site. He also stated that Respondent created a fundraiser for a student on the site and felt she "pushed" students to support this cause. Complainant 4 stated that Respondent used the Facebook page to post course information beyond Blackboard.

During the spring 2014 audio records, Respondent is heard explaining the benefits of the Historians of Tyler Facebook page to the class. Respondent states that "the "HOTties" will have first access to the fall schedule which will be posted on Friday".

During the interview the Respondent was asked if the "HOTties" site was the page created for an Educational purpose, she indicated it was not. Respondent also addressed this in her written response, however she is overheard during the first class informing students that the "HOTties" will have first access to the fall schedule. This contradiction contributed to the student's perception that the "HOTties" site was an official University of Texas site.

   3.  Evidence in support of the conclusion that Dr. Linehan discussed and engaged students in her personal life

      c.  Respondent discussed her personal life with students

Multiple witnesses stated that Respondent discussed her personal life with students. Complainant 4 stated that Respondent used class time to discuss her personal life.  Respondent is heard discussing "████" and "████" during the audio recording of the HIST 5388 course (which were not class-related discussions). Respondent indicated that ████ had been discussed with students because many knew he was her best friend.

14

Complainant 5 stated that Respondent spoke frequently about an individual named "███" when he was a student in her undergraduate courses. Witness 1 recalled that Respondent spoke frequently of her physical trainers in class. Witness 3 provided copies of his electronic communication with Respondent. Two individuals are mentioned frequently, "███" (Witness 3 thought he was a friend of Respondent) and "Trainer" (whom he thought was her personal trainer). Respondent is heard making reference to being in a bad mood on the audio recording from the HIST 5388 course, stating "███ and I aren't speaking...." (which was not a class-related discussion).

Complainant 4 recalled several statements made by Respondent during an undergraduate class in 2011 that she felt were inappropriate and not pertaining to the course content. Respondent made statements about finding some lesbians on Craigslist that were going to Canton Trade Days and that she wanted to go but she didn't want to be the "awkward or the fourth or fifth person".

Complainant 4 also recalled Respondent making a comment that the reason Nancy Regan's skin appeared so young is because she put Ronald Regan's sperm on her face every night. Respondent stated that she did not make these statements but instead stated that Complainant 5 had shared the information related to Nancy Regan.

Witness 3 stated that Respondent asked him to run errands for her while he was a graduate student in the department. She asked him to pick up her lunch, get her drinks, to run personal errands both on campus and off and to perform various tasks at her home. Witness 3 stated that tasks performed at her home included things like taking out the trash, and picking her up from the airport. He stated that he was compensated by Respondent. Respondent confirmed that Witness 3 performed various tasks for her at her home for which he was compensated. She stated that Witness 3 was not her Graduate Assistant at the time and that she did not refer to him as her "home improvement dude". She indicated that tasks performed in her home had no effect on their academic life. She also stated that she stopped utilizing students for personal tasks in her home when Dr. Slann informed her to stop.

Witness 3 stated that Respondent called him multiple times, often multiple times a day on his personal phone regarding topics unrelated to his academics. He also states that she made an issue of wanting to speak to his personal physician regarding his health. The Dean of Students verified this exchange in the documentation provided by Witness 3 dated August 8, 2010. Respondent requested that he bring her ice cream after sharing that she asked "Trainer" to bring her ice cream the night before, this exchange was verified in the documentation provided by Witness 3 dated August 6, 2010.

Witness 3 recalled a time when Respondent directed him to pick up an envelope left for her on campus by "Trainer" (a person Witness 3 understood to be her personal trainer) and bring it to her office. Respondent sent him an email from "Trainer" dated November 4, 2010 that indicated that he was attempting to provide the respondent with a refund ($400 in cash) for services not rendered.

15

"Trainer" further states that he is aware that she has students' involved in her personal business transactions and dealings and that that is a violation of the universities code of ethics. Respondent sent this message to Witness 3 and he was later instructed to disregard the email and to delete it. The copy of this correspondence provided by Witness 3 indicates that Respondent addressed/forwarded the messages directly to Witness 3's email. Respondent denies that Witness 3 picked up the money on her behalf.

Based on the foregoing evidence, I find Respondent's conduct unprofessional and inappropriate such as interacting with students electronically regarding topics that were non-academic in nature; asking students to run errands not related to the educational environment; intruding in students personal lives and using social media as a means of intruding in the personal lives of students without their permission.

I also find that it is more like than not that Dr. Linehan communicated the "HOTties" site to students in such a way that many perceived it to be associated with The University of Texas at Tyler, Department of History.

## F.   Allegation 6 - Respondent created a hostile environment where students feared retaliation.

This section will address the evidence and findings related to whether Dr. Linehan created a hostile environment for students.

   1.  Evidence in support of the conclusion that Dr. Linehan created a hostile environment for students where students feared retaliation

      a.   Respondent created a hostile environment

Witness 3 provided numerous exchanges between Respondent and himself. An email exchange dated November 8, 2010 where Witness 3 states "All am trying to tell you I'm busy and stressed out so please stop sending me your problems I'm tring to finish this paper so I can move on to the next thing that needs my attention….", he later states "I have asked you to stop emailing me, now it appears that you are somehow attacking me as a person as well as a student. Because of this I feel we can no longer operate on a student professor relationship." Witness 3 indicates that he will take all communication between him and Respondent to the Deans office. He provided the department of History with a copy of his email exchanges.

Multiple witnesses indicated that they were made to feel uncomfortable due to the statements made when referring to Complainant 1 as a "slut", "prostitute" or a "whore".

Complainant 2 states that after sharing her academic grievances with Respondent she felt humiliated in class.   Specifically, Respondent challenged her perception of the concern related to

16

the changes in class stating that none of the other class members had issues. Complainant 2 felt that she was being graded more harshly on Blackboard after addressing her grievance. Complainant 2 stated that students were afraid to come forward because they were afraid of what Respondent would do to their grades or their career.

Complainant 3 also stated that she found Respondent to be combative after she expressed her academic concerns directly to her and that she was afraid the respondent would retaliate against her for coming forward.  For example, Respondent accused Complainant 3 of plagiarism, stating that the source she used for her book review was not acceptable. Complainant 3 was able to determine via Blackboard that other members of her class were utilizing the same source.

Complainant 4 stated that she felt students were intimidated by Respondent and that she would retaliate against them through grades and impacting their ability to graduate. Complainant 4 also felt this fear intimidated students into not expressing their concerns about Respondent's class. Multiple witnesses (current and former students, Complainant 5, Witness 3, Complainant) indicated a fear that she would impact their academic careers.

Complainant 5 stated that Respondent would make comments about a student's personal life in class and that she would bash/go after/attack with posts to Blackboard that could be viewed by other members of the class. For example, he perceived that if she didn't like the students she would attack them by grading them poorly on Blackboard. She had no written expectations for what students should post on Blackboard.

Witness 4 stated that the overall tension he experienced in the spring 2014 class as it pertained to academic issues, personal perceptions and hostilities affected his classroom experience.

Witness 1 stated that following summer 2011 he felt Respondent was not fair with regard to grading and class participation and he dropped the class. He felt she graded males more harshly. He indicated that he could not enroll at UT Tyler and pursue a Master's degree in History as long as she was on faculty because he feels she has not treated him fairly.

Witness 3 indicated that Respondent made him feel obligated to her because she placed him in an adjunct position, using the phrase "reciprocity" when explaining his relationship with her.

Witness 3 was quite adamant about his fear of her influence on his ability to secure employment in his field and in academia. He stated that he withheld his true place of employment from anyone who might know her, expressing that the academic community was small and that he told individuals that he was employed at one college while actually working at another in an attempt to prevent her from harming his career. Respondent stated that she was surprised to hear that students were of afraid of her. When asked what reasons Witness 3 thought she might retaliate against him, he stated "Other than the fact she is a pyscho? No. She is extremely clever and to her it's probably just good sport ruining anyone who stands up to her."

17

Witness 3 was asked if he was interested in returning to UT Tyler to pursue other courses he indicated that he was and that he "loved higher learning" but he would not return nor allow his children to attend the university as long as she was teaching at UT Tyler.

Based on testimony of each witness, I find that it is more likely than not that Respondent created a hostile environment where the students feared that the Respondent would negatively impact their grades or influence their academic career.

## VII.
## CREDIBILITY ASSESSMENTS

All complainants and witnesses were interviewed in person. When follow-up was necessary all witnesses and complaints (with the exception of Complainant 2/witness) responded in a timely fashion and adequately addressed the questions presented.

A.   Complainant 1 – When Complainant 1 met with me she was calm and able to recall and articulate instances where Respondent made comments that made her feel uncomfortable. She also conveyed no malice and made a point of providing her own justification for the use of language when she perceived it as a joke.

B.   Complainant 2 – I found Complainant 2 to be forthcoming and honest with regard to the presentation of information regarding her complaint. She was genuinely concerned about the dynamics of the course and her ability to succeed in the course based upon the environment.

C.   Complainant 3 – I found Complainant 3 to be open and willing to share information related to the complaint. Her message was consistent each time I met with her and her concerns related to the complaints were corroborated by other witnesses. Complainant 3/witness indicated that prior to the complaint regarding her academics she had a positive relationship with the Respondent.

D.   Complainant 4 – Complainant 4 was calm and meticulous with regard to recalling incidents related to the complaint. She provided evidence to support various statements and openly acknowledged that she previously had a positive relationship with Respondent.  She expressed her desire to improve the professionalism of the faculty member as well as improve the course for future students.

E.   Complainant 5 – Complainant 5 was composed and direct when addressing the nature of his complaint. He articulated clearly his experiences and concerns regarding professionalism and challenges related to academic issues.

18

UTT_001090

F.  Witness 1 – Witness 1 presented his experiences in a clear and concise manner. He was open with regard to the challenges related to his interactions with Respondent regarding a perceived threat.

G.  Witness 2 – Witness 2 was direct with regard to answering questions and willingly offered information from her perspective. Witness 2 stated that Respondent was a great advisor and that she had been helpful to her academically.

H.  Witness 3 – I found Witness 3 to be very thoughtful when addressing questions. It was evident from his demeanor that he felt the need to be guarded when responding. He was fearful that Respondent would find out where he was and impact him professionally. His statements related to his experiences were supported significantly by documentation and by other witnesses.

I.  Witness 4 – Witness 4 was calm and thorough during the interview. I felt he was honest with regard to his perception of the "perceived" complaint related to gender and indicated that he was not offended.

J.  Witness 5 – When interviewed Witness 5 was open and honest when conveying her knowledge of the interaction with Witness 3. She clearly recalled his concern for confidentially as it related to his academics and career based upon his experiences with the respondent.

K.  Witness 6 – Witness 6 was calm and direct while conveying her interactions with Witness 3. She was honest as it pertains to areas she was unable to recall due to the time period. She provided supporting documentation in a timely manner as it pertained to the complaint as presented by Witness 3

L.  Witness 7 – Witness 7 responded promptly to questions when asked. Was direct and forthcoming when providing information. I found him to be a credible witness.

M.  Respondent – Respondent was calm when conveying her responses to questions and considerate when evaluating questions for which she was unsure. She seemed genuinely confused by various statements when asked to confirm or deny if those statements were made by her.

UTT_001091

# VIII.

## CONCLUSION

*Allegations of Respondent's Comments of a Sexual Nature*

Complainant 1 alleges that Respondent consistently referred to her as a "slut" or a "prostitute". Both Complainant 1 and Respondent agree that the use of the language (specifically prostitute) was introduced as part of a class exercise during 2012. Complainant 1 and several witnesses state that Complainant 1 was introduced during the 2012 class and future classes with Respondent using the term "slut" or "prostitute" to refer to Complainant 1. Although Respondent states that Complainant 1 introduced herself in this manner and that she only addressed the language to clarify, this was not the case during the first class of the spring 2014 semester of the History 5388.001 course as Respondent is clearly heard referring to Complainant 1 as "slutty girl" on course audio and making a statement which implies that the language has been used previously. While I do find that the Respondent did use the terms "slut", "prostitute" or "whore," she explained that it was used as a term to discuss an academic issue related to the Women's History Class and Complainant 1 admitted that it was initially used as part of a class exercise. Based on witness testimony indicating that the Respondent referred to Complainant 1 as a "slut", "prostitute" or "whore" during semesters beyond 2012 and the Respondent's use of the phrase "slutty girl" during the spring 2014 course I find that it is more likely than not the Respondent utilized these or similar terms beyond the 2012 semester in a manner not germane to the course subject. I find the Respondent used terms that were directed towards an individual that were unprofessional and inappropriate for the classroom and thus I find her in violation of the Sexual Harassment Policy, specifically Sexual Misconduct.

*Allegations of Respondent's Treatment Based on Gender*

Several Complainants allege that Respondent addressed a male member of her class during the spring 2014 semester of the History 5388.001 course by referring to him as "she" or "her". The student in question stated that he was not offended by any of the comments made by Respondent and thought they were said in jest. Although students confirmed that she referred to a male as a "she" or "her", Respondent stated that she did not refer to a female student as male or a male student as female. Regardless, I find that these comments by Respondent were indeed made and although I feel the Respondent has a proven pattern of demeaning males, I do not find enough evidence to conclude that in this instance the comment(s) were intended for that purpose.

Allegations related to attire were not limited to one gender however students confirmed that the Respondent's reference to a student as "she" or her" during class stemmed from his footwear. Respondent verified that she made comments regarding students specifically wearing flip flops and provided a reason for these comments that pertain to the student's safety. Although a female student complained that she was frequently referred to as "Polo" because of her choice of attire— which Respondent denied, males were largely the focus of her comments.  In sum, the frequency of these comments over a period of time created an environment where students (particularly, male students) were uncomfortable wearing not only flip flops but any open-toed shoes.

20

UTT_001092

Complainants also alleged that Respondent conducted a "Mr. Women's History Pageant (which included the males in her class) in one of her courses where the male winner was given a feather boa to wear during the class; that Respondent made a statement about giving out "tampons" as prizes; and that male students were asked to answer "sensitive" questions that were meant to put the male students in touch with their "other genetic side". Respondent admitted to holding this pageant but stated that the contest was a pedagogical technique utilizing questions that are things only women would know. I find that the Respondent engaged in inappropriate treatment of males by requiring male students to participate in a Mr. Women's History Pageant and that prizes that were feminine in nature (such as mirrors, women's magazines, lotions) were awarded to the male students. I also find that the effect of this contest was to demean male students because Respondent's view of men is negative (i.e. she thinks "men are pathetic.") Also based on her negative view of men and the feminine nature of the prizes given to males who participated in this contest I find that it is more likely than not that Respondent made a statement about wishing she had brought her tampons so she could have given the men contestants tampons as prizes. While I do not find that Respondent conduct related to the "Mr. Women's History Pageant" constitutes sexual misconduct, I do find that it was discriminatory based on gender (i.e., male) and thus violates the Nondiscrimination Policy.

Finally, several witnesses indicated their personal experiences with Respondent's opinion of men. Specifically, various witnesses stated that they or their male peers received poor grades, and that males were treated differently in class based on their gender. Indeed, one witness provided evidence that Respondent was aware of this perception and asked that she assist her in changing this perception. In addition Respondent is heard on audio using negative language as it pertains to men, this pattern is substantiated by witness account.  Respondent response to this allegation and perception was that she had never treated males differently, graded them differently, or stated that she had general dislike for males or asked a student to help change this perception.

In sum, students' allegations that Respondent treats males differently than females is supported by the evidence. For example, the consistent use of a contest singling out one gender (i.e., males), and multiple statements made during class indicating a general dislike for males support the allegation that Respondent created an environment where male students felt intimidated and uncomfortable.

### *Allegations that Respondent created an environment where males felt intimidated and uncomfortable*

Complaints and witness indicated that over time they perceived Respondents opinion of men to be negative based upon comments such as "men are pathetic", men are the number one thing that upset her and that males were singled out in classes. Respondent indicated that she did not treat males differently nor did she grade them differently. While allegations related to grades were not confirmed, the use of language related to men is documented. Respondent is noted requesting Complainant 4 to "talk" to men and let them know it was okay to take her class, which confirms her knowledge of a perception that male students were fearful of taking her class.

Various Witnesses indicated that Respondent belittled males, put them down or behaved in a sexist way towards males. Complainants and witnesses also indicated Respondent implied that men wear worth less by stating that the male student should be a girl and that girls received "A" grades.

21

Respondent's consistent use of the "Mr. Women's History" pageant and the type of questions and prizes presented support the allegation that Respondent made males feel uncomfortable.

Furthermore two Witnesses, indicated that they feared the impact she could have on their academic career. One witness stated that he withdrew after feeling she did not grade him fairly and that he would not return as long as she was on faculty with the department. A second witness indicated that he would not return to the University and that he had taken extra measures to insure that she would not be able to locate him after he graduated in order to prevent Respondent from having a negative impact on his career.

Respondent over time created an environment where males felt intimidated and uncomfortable due to her use of language, singling them out in class and references to low grades.

*Allegations regarding Respondent's Comments Related to Attire*

While it is evident Respondent made numerous comments related to student's footwear there is no indication that these comments were used to target a specific gender. Complainant 4 indicated that Respondent referred to her as "Polo" so frequently that she became uncomfortable and stopped wearing that style of clothing. While there is no direct evidence that Respondent referred to complainant or that the use of the term if used was related to her gender, the pattern of overly targeting students based upon their attire (i.e. footwear), frequently bringing up former language to introduce students (i.e. "slut", "prostitute", "whore") and the reference to a male student as "she" or "her" indicate that it is likely a student would perceive any such comments as uncomfortable and consistent with Respondents demeaning of individuals based upon gender.

*Allegations regarding Respondent's Unprofessionalism*

Complainants allege that Respondent would take phone calls during class; ask students to answer her phone during class; and direct students to participate in a non-academic Facebook page called the "HOTties". These allegations of unprofessionalism have been verified by numerous witnesses and the History 5388.001 course audio recordings. Respondent frequently made reference to individuals who were perceived by students as her friends during class and is heard discussing those individuals during the course audio recordings.

While Respondent provided background regarding the purpose of the "HOTties" Facebook page, witnesses, however, students indicated their confusion over the use of this site and its application as it related to their course work (i.e., whether it was an official form of class communication). More specifically, the site was used for purposes unrelated to the course such as acquisition of student's personal photos, re-posting photos or information about students to this site without permission and thus contributed to the students' confusion. Respondent admits frequenting individual student's Facebook pages and utilizing their images elsewhere without their permission. During the audio recording of the History 5388.001 course, Respondent is heard making comments similar to "creeping" their pages even though she was told by Dr. Martin Slann to cease this activity on May 8, 2012.  Based on the level of personal comments, phone calls, use of language when referring to students, continued misuse of social media and information shared about and on the

UTT_001094

Historians of Tyler site, it is clear that that Respondent engaged in conduct that was not professional.

***Allegations that Respondent created a hostile environment where students feared retaliation if they reported her conduct.***

Several students indicated their concerns regarding Respondent's treatment of students—citing her demeanor in class; body language; observed treatment of males and females; and the issues related to academic course challenges in the spring (which are addressed by the College of Arts and Sciences in a concurrent investigation) contributed to a general fear of retaliation.  For example, Complainant 1 originally submitted an anonymous letter complaint to the department because she feared retaliation by Respondent. Also a student witness verified that Respondent called another student an "ass" after that student could not do something Respondent wanted him to do.  After speaking with Complainant 1 and other witnesses, I found their fear of retaliation to be genuine.

Generally, I believe that Respondent created a hostile environment for students (and males in particular). Witness 3 and Witness 1 both indicated that they would not return to UT Tyler unless she was not longer employed. Their concerns stemmed from a fear that she would have a negative impact on their academic career. The most recent complaints filed by the Complainants articulate the same concern. Complainant 1 was initially unwilling to submit her complaint regarding the academic issues and her treatment due to fear.

After completing the interviews and reviewing documentation presented, the evidence indicates that Respondent was in violation of The University of Texas at Tyler HOP 2.4.4, *Sexual harassment by faculty, staff, or visitor*, HOP 2.4.1 *Nondiscrimination Policy and Complaint Procedure* and that she engaged in unprofessionalism conduct.  The Complainants were made to feel uncomfortable by these comments and behaviors. I also found her statements "men would be number one" thing that upset her and that "men are weird...pathetic" as strong evidence of her general dislike of males and the basis for treating them differently.  Based on multiple witness interviews, corroboration among statements made by the Complainants, audio files from the spring History 5388.001 class, and various documents, the evidence shows that gender bias was real as it pertains to men.  Thus, Respondent was not only unprofessional but created an environment where students were limited in their ability to participate in or benefit from UT Tyler's educational program on the basis of gender.

Respondent violated The University of Texas at Tyler HOP 2.4.4, *Sexual harassment by faculty, staff, or visitor* by engaging in inappropriate verbal conduct of a sexual nature inappropriate for the classroom.  Based on the documentation and witness corroboration Respondent is also found to have violated HOP 2.4.1, *Nondiscrimination Policy and Complaint Procedure* by engaging in conduct that discriminated against students based on gender.  Based on the violations of policy, I recommend that the Provost and Vice President for Academic Affairs consider taking disciplinary action, up to and including termination, against Respondent.

UTT_001095